## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**SHEENA FAWN HUNT,**

      **Plaintiff,**

**v.**                                  **Case No.: 1:21-cv-00265**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### <u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be

**AFFIRMED,** and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On September 14, 2018, Plaintiff Sheena Dawn Hunt ("Claimant") protectively filed for DIB, alleging a disability onset date of September 1, 2018 due to "coronary artery disease, HBP, shortness of breath COPD, chronic lower back pain with sciatica, GERD, lumbar radiculopathy, and depression with anxiety disorders." (Tr. at 321-25, 338). After the Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration, Claimant filed a request for an administrative hearing, which was held on December 2, 2020 before the Honorable Nathan Brown, Administrative Law Judge (the "ALJ"). (Tr. at 49-77). By written decision dated January 13, 2021, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 20-48). The ALJ's decision became the final decision of the Commissioner on February 24, 2021 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action, seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 11), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12). The time period within which Claimant could file a reply to the Commissioner's response expired. Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 51 years old on her alleged disability onset date and 53 years old on her date last insured. (Tr. at 26, 37). She has the equivalent of a high school education, communicates in English, and does not have any past relevant work. (Tr. at 37, 337, 339).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. WeinBerger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after

rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1).

Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through December 31, 2020. (Tr. at 26, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 1, 2018, the alleged disability

5

onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: asthma, chronic obstructive pulmonary disease, coronary artery disease, atrial fibrillation, degenerative disc disease, osteoarthritis of the hips and sacroiliac joints, bilateral carpal tunnel syndrome, bilateral venous insufficiency of the left extremity, hypertension, and hearing loss. (*Id.*, Finding No. 3). The ALJ considered Claimant's other diagnosed conditions, including anxiety disorder, depressive disorder, panic disorder, and posttraumatic stress disorder, but the ALJ found that the impairments were non-severe. (Tr. at 26-28).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 28-30, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can operate foot and hand controls bilaterally frequently. The claimant can handle and finger items frequent[ly] bilaterally. She can never climb ladders, ropes, or scaffolds or crouch. She can occasionally climb ramps and stairs, stoop, kneel, and crawl and frequently balance. The claimant can occasionally work at unprotected heights and work around heavy or hazardous machinery. She can frequently operate a motor vehicle. The claimant can frequently work in atmospheric conditions, extreme cold, and extreme heat. She can occasionally work in vibration and in moderate noise, as defined by the SCO.

(Tr. at 30-37, Finding No. 5).

At the fourth step, the ALJ determined that Claimant did not have any past relevant work. (Tr. at 37, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 37-38, Findings 7 through

10). The ALJ considered that (1) Claimant was born in 1967 and was defined as an individual closely approaching advanced age on her alleged disability onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant did not have any past relevant work. (Tr. at 37, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a garment folder, price marker, and mail clerk. (Tr. at 37-38, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 38, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts two challenges to the Commissioner's decision. First, she contends that the ALJ did not account for her mild mental limitations in the RFC finding. (ECF No. 11 at 7-8). Second, Claimant argues that the ALJ's RFC assessment lacks substantial evidence because there was no treating or examining opinions in the record, and the ALJ should have ordered a consultative examination or submitted medical interrogatories to an expert. (*Id*. at 10).

In response to Claimant's challenges, the Commissioner maintains that substantial evidence supports the ALJ's conclusion that Claimant's mental impairments were well controlled by medications and did not impose any significant work-related functional limitations. (ECF No. 12 at 12). The Commissioner notes that the law does not require an ALJ to assess RFC restrictions for mild mental limitations. (*Id*. at 15-16). The Commissioner further asserts that the ALJ reasonably found that

Claimant could perform a limited range of light work and no further development of the record was necessary. (*Id.* at 16-20).

## V.    Relevant Evidence

The undersigned examined all of the evidence in the record. The following evidence is most relevant to the issues in dispute.

### A. Treatment Records

On February 15, 2018, Claimant's psychiatrist, Hassan Jafary, M.D., recorded that Claimant was psychiatrically stable. (Tr. at 786). Her diagnoses included panic disorder, insomnia, and depression not otherwise specified, and she was prescribed Zoloft, Remeron, and Klonopin. (*Id.*). A few months later, on May 16, 2018, Claimant had an initial physical therapy evaluation due to low back pain that radiated into her left lower extremity. (Tr. at 544). Claimant explained to the physical therapist that she suffered from back pain since 2013 when she fell out of a camper, but the pain on the left side of her lower back was worse since she fell again a few weeks earlier. (*Id.*). The plan was for Claimant to participate in 12 physical therapy sessions, but she was discharged after six appointments on October 23, 2018 because physical therapy increased her pain. (Tr. at 529-30, 546). On July 20, 2018, Frederick B. Morgan diagnosed Claimant with bilateral carpal tunnel syndrome. (Tr. at 521).

Dr. Jafary recorded on August 2, 2018 that Claimant was doing fine, sleeping and eating good, tolerating medication fine, and her mood and anxiety were stable. (Tr. at 792). Claimant was calm, alert, and well groomed; her speech was normal rate and volume; her insight and judgment were good; and she said that she was "doing good" with appropriate affect. (*Id.*). There were no objective abnormalities on examination. (*Id.*). Claimant's diagnoses and treatment plan were continued, and she remained

psychiatrically stable. (*Id*.).

On September 10, 2018, Dr. Jafary documented that Claimant was doing good, her medication regimen was working well, and she had no complaints or pain. (Tr. at 794). Claimant did not have any physical or mental abnormalities on examination. (*Id*.). She was in no acute distress, alert and oriented, well groomed, and breathing comfortably and normally. (*Id*.). She displayed normal gait, movement and strength in extremities, and speech; no focal deficits; good mood, insight/judgment, attention, and concentration; appropriate affect; logical and goal-directed thought process; and intact memory and recall. (*Id*.). Her diagnoses and treatment plan were unchanged. (Tr. at 794-95).

Claimant advised Dr. Morgan on October 1, 2018 that splinting improved her carpal tunnel symptoms. (Tr. at 522). On October 10, 2018, Dr. Jafary recorded that Claimant was "a little" anxious and sad because it was hunting season, which was the time of year that her son died, but otherwise Dr. Jafary noted the same findings, diagnoses, and treatment plan. (Tr. at 796-97). Claimant's November 1, 2018 lumbar MRI showed relatively unchanged degenerative disc disease and face arthropathy. (Tr. at 675). She had a disc protrusion at L5-S1 that was likely impinging on her right S1 nerve root, and she had mild right foraminal narrowing at L4-L5 and L5-S1. (*Id*.). Claimant also had a probable right kidney cyst. (*Id*.). Her cervical MRI, which was taken the same day, showed multilevel degenerative and uncovertebral hypertrophy disc disease, including mild and moderate thecal sac and bilateral foraminal narrowing at C3-C5 and a disc bulge at C6-C7 without thecal sac or foraminal narrowing. (Tr. at 678).

On November 5, 2018, Claimant presented to orthopedic spine surgeon Rajesh

V. Patel, M.D., regarding neck and back pain. (Tr. at 731). Dr. Patel diagnosed Claimant with mild carpal tunnel syndrome, right S1 radiculitis, lumbar disc bulge at L5-S1, right lateral recess narrowing at L5-S1, lumbar facet arthropathy at L3-S1, bilateral cervical neural foraminal narrowing at C4-C5, and cervical degenerative disc disease. (Tr. at 733). He recommended conservative treatment for Claimant's neck impairments and stated that lumbar decompression and fusion was possible, but Claimant wanted to delay surgery as long as possible. (*Id.*).

Claimant told Dr. Jafary on November 8, 2018 that her anxiety was much worse and affecting her ability to function, yet Dr. Jafary did not find any physical or mental abnormalities. (Tr. at 798). In fact, Claimant's mood was euthymic during her visit. (*Id.*). On November 13, 2018, Claimant followed up with her cardiologist, Jebran Karam, M.D., who had previously ordered testing to evaluate her reported chest pain. Dr. Karam noted that Claimant's stress test was negative, echocardiogram showed normal function with mild valvular disease, carotid doppler indicated nonobstructive disease bilaterally, and her Holter monitor showed normal sinus rhythm. (Tr. at 635). In addition, Claimant was active, her blood pressure was controlled, and she denied chest pain, tightness, or pressure; syncope; palpitations; orthopnea; numbness; weakness; tingling; or slurred speech. (*Id.*).

On December 7, 2018, Claimant told Dr. Jafary that she was sad because it was the eighth anniversary of her son's death, and she likewise expressed to him that she was a little anxious and depressed on January 7, 2019. (Tr. at 800-01). However, Claimant's mental status examination findings were normal during both appointments. (*Id.*). Claimant reported continued moderate neck and back pain to Dr. Patel on January 14, 2019. (Tr. at 735). Dr. Patel still recommended conservative

treatments, including a neck collar and referral to a pain management clinic. (Tr. at 736-37). Claimant's mood was better overall during her March 5, 2019 appointment with Dr. Jafary, and he did not find any objective abnormalities on examination, made the same diagnoses, and renewed Claimant's same medications. (Tr. at 802).

On May 15, 2019, Dr. Karam ordered a left heart catheterization because Claimant complained of increased dyspnea on exertion, fatigue, lethargy, and weakness. (Tr. at 1119). The catheterization performed on May 30, 2019 showed mild to moderate coronary artery disease, normal left ventricular function, and normal wall motion. (Tr. at 1083). Claimant presented to pulmonologist Charles E. Porterfield, D.O., on July 2, 2019, reporting shortness of breath. (Tr. at 1033). Claimant smoked one-half to one pack of cigarettes per day for 35 years. (*Id.*). Dr. Porterfield diagnosed Claimant with paroxysmal nocturnal dyspnea, daytime hypersomnia, psychophysiological insomnia, and asthma. (Tr. at 1037). He prescribed inhalers and ordered a sleep study. (*Id.*).

Claimant underwent right carpal tunnel release surgery on October 29, 2019. (Tr. at 1284). Dr. Jafary did not find any objective abnormalities during his examinations of Claimant on October 7, November 5, or December 4, 2019, although Claimant reported some anxiety and depression because it was winter, and her son died in the winter. (Tr. at 1189-94). Claimant remained psychiatrically stable with no changes to her diagnoses or treatment plan. (*Id.*). On January 3, 2020, Claimant said her medication was working well, she was "doing fine," there were no changes in her diagnoses or medications, and she was psychiatrically stable. (Tr. at 1195-96).

Claimant reported heart palpitations to Dr. Karam on January 16, 2020. (Tr. at 1185). Dr. Karam believed it was caused by Claimant quitting smoking, and he

prescribed the maximum dose of Toprol. (*Id.*). Claimant was a "little anxious" during her follow up appointment with Dr. Jafary on February 3, 2020, but she stated that she was just worrying about catching the flu and was otherwise fine. (Tr. at 1197). On April 2, 2020, Claimant similarly expressed that she was anxious about coronavirus, and, on May 5, 2020, Claimant stated that she was staying home due to the pandemic, but she was staying occupied by cleaning a lot. Dr. Jafary did not find any objective abnormalities during Claimant's February, April, May, or June 2020 examinations, and Claimant was remained psychiatrically stable without changes to her diagnoses or treatment plan. (Tr. at 1197-98, 1640-47).

During a telehealth visit with Dr. Karam on May 27, 2020, Claimant said that her blood pressure was elevated the last few days, which Dr. Karam attributed to dietary non-compliance, and he prescribed Norvasc. (Tr. at 1712-13). Claimant followed up with Dr. Karam on July 20, 2020, and she denied chest pain, tightness, or pressure; numbness; weakness; or slurred speech. (Tr. at 1804). Claimant stated that her blood pressure fluctuated, noting the stress of her cousin's recent death in a traumatic motorcycle accident and the deaths of multiple family members, but Claimant stated that her blood pressure was presently controlled. (*Id.*).

On July 28, 2020, Claimant stated during a telehealth visit with Dr. Jafary that her anxiety was high, so Dr. Jafary increased her prescription for Klonopin. (Tr. at 1648). There were no other issues or changes during that visit. (Tr. at 1648-49). On September 9, 2020, Dr. Patel ordered an updated MRI to evaluate Claimant's worsening back pain. (Tr. at 1813, 1815). Before it occurred, Dr. Jafary recorded on September 24, 2020 that Claimant did not have any issues. (Tr. at 1884-85). Her lumbar MRI on October 6, 2020 showed no changes. (Tr. at 1930). On October 14,

2020, Dr. Porterfield recorded that Claimant's oxygen saturation was 98 percent and she had normal breath sounds without rhonchi, wheezing, rales, or crackles. (Tr. at 1940-41). Claimant told Dr. Patel on October 21, 2020 that she was having some pain in her lower back and right leg, and she was taking Tylenol for pain relief. (Tr. at 1864). She displayed depressed mood during an appointment with Dr. Jafary on October 27, 2020, but there were no other concerns. (Tr. at 1886-87).

### B. Evaluations, Opinions, and Prior Administrative Findings

On December 17, 2018, state agency psychologist Joseph A. Shaver, Ed.D., performed a psychiatric review technique based upon his review of Claimant's records. He assessed that Claimant's ability to adapt or manage herself was mildly limited, but she was unlimited in the other paragraph B categories. (Tr. at 108). At the reconsideration level of review on March 8, 2019, state agency psychologist James Capage, Ph.D., concluded that Claimant had mild limitations in the areas of understanding, remembering, or applying information and adapting or managing herself and moderate limitations interacting with others and concentrating, persisting, or maintaining pace. (Tr. at 125-26). Dr. Capage assessed that Claimant could understand, remember, and carry out three-step work activities, make simple routine work-related decisions, and maintain concentration for simple tasks, and she would be best suited in a work setting that did not involve a great deal of contact with the public. (Tr. at 131).

On September 12 and October 2, 2019, consultative psychologist Kimberly D. Caudell, M.A., examined Claimant. (Tr. at 1131). Claimant reflected depressed mood, labile affect, circumstantial thought processes, and moderately deficient recent memory. (Tr. at 1134). Her concentration fluctuated, but she completed the Serial

Sevens Test with only one error. (*Id*.). Claimant expressed normal orientation, thought content, perception, judgment, and immediate and remote memory, and her insight was fair. (*Id*.). She stated that her daily activities included getting dressed, taking medication, watching television, listening to music, reading, sometimes helping with laundry and cooking, showering or bathing, spending time with her brother when he visited and her friend who came over at least once per week up to a few times a week, and going to monthly medical appointments. (Tr. at 1136).

On January 29, 2019, Dr. Jafary completed an RFC questionnaire. He opined that Claimant's symptoms frequently interfered with her attention and concentration and she was incapable of even low stress jobs. (Tr. at 771).

### C. Claimant's Testimony

Claimant testified during her administrative hearing on December 2, 2020 that she experienced dull aching low back pain and sometimes stabbing pain extending into both legs and numbness and tingling. (Tr. at 56). She took Tylenol for pain relief, applied moist heat, received injections, and sometimes wore a back brace, but the only thing that helped was "laying." (Tr. at 56-58). Claimant testified that she also suffered from heart flutters, constant shortness of breath, daytime fatigue, and occasional dizziness (Tr. at 58-59). She had trigger finger surgery on her non-dominant right hand, but her hand was numb around the incision and very weak. (Tr. at 59-60). Her left hand was "basically the same," but she did not have surgery on it yet. (Tr. at 60). Claimant testified that she did not like to be around people and had trouble with concentration and memory. (Tr. at 63-64).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is

14

based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant's challenges concern the ALJ's RFC assessment, which is the "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* The ALJ's RFC determination requires "a function-by-

function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### A. Mental Impairments

Claimant argues that the ALJ should have assessed RFC restrictions to account for her mild limitations in the paragraph B categories of understanding, remembering, or applying information and concentrating, persisting, and maintaining pace. (ECF No. 11 at 7-8). The category of understanding, remembering, or applying information "refers to the abilities to learn, recall, and use information to perform work activities," including "[u]nderstanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00E(1) (effective Mar. 14, 2018 to Apr. 1, 2021).

The ALJ noted that Claimant alleged difficulty remembering and understanding and had moderate limitation in recent memory during her consultative examination. (Tr. at 27). However, the ALJ considered that Claimant could follow written instructions fairly well, count change, pay bills, handle a savings account, and use a checkbook. (*Id*.). Claimant also read and watched television, her remote and

17

immediate memory were unimpaired during her consultative examination, and her treatment records documented her intact memory and recall. (*Id.*). For those reasons, the ALJ assessed that Claimant had mild limitation in the functional area of understanding, remembering, and applying information.

The category of concentrating, persisting, and maintaining pace concerns "the abilities to focus attention on work activities and stay on task at a sustained rate," including "[i]nitiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00E(3) (effective Mar. 14, 2018 to Apr. 1, 2021).

In that category, the ALJ noted that Claimant alleged that she had difficulty concentrating and completing tasks. (Tr. at 27). However, she followed written instructions, read, watched television, paid bills, counted change, and handled a savings/checking account. (*Id.*). Although her concentration fluctuated during her consultative examination, she made only one error in the Serial Sevens Test, and her treatment notes consistently documented her good concentration and attention. (*Id.*). Therefore, the ALJ assessed that Claimant was mildly limited in the functional area of concentrating, persistence, or maintaining pace. (*Id.*).

Importantly, Claimant does not challenge the ALJ's step two findings, including the ALJ's conclusions that she had mild mental functional limitations and her mental

impairments were non-severe. Rather, Claimant contends that the ALJ should have assessed RFC restrictions to account for her mild limitations in two functional categories. (ECF No. 11 at 7-8). For some reason, Claimant does not focus on the categories of interacting with others and adapting or managing oneself in which she was also mildly limited. In any event, the undersigned considered whether the ALJ adequately explained and supported his rationale for not assessing mental RFC limitations.

In evaluating this challenge, the undersigned notes that the Court recently remanded a decision because an ALJ did not consider Claimant's mild mental functional abilities in the RFC analysis. *Shank v. Saul*, No. 3:20-CV-00444, 2021 WL 2767063, at *8 (S.D.W. Va. June 11, 2021), *report and recommendation adopted,* No. CV 3:20-0444, 2021 WL 2744550 (S.D.W. Va. July 1, 2021). However, in that case, the ALJ omitted Claimant's mental impairments from the RFC assessment other than to list them among Claimant's allegations at the beginning of the discussion. The Court explained that the ALJ did not "provide any insight into why he did not assess any mental RFC restrictions," and, without anything to base review, it was impossible to determine if the RFC finding was supported by substantial evidence. *Id*. at *8.

By contrast, in the present matter the ALJ clearly evaluated Claimant's mental functional abilities and articulated why he did not assess any mental RFC limitations. The ALJ noted that Claimant's daily activities were not markedly limited, as she cooked, watched television, played games on her phone, read, listened to music, visited with family and friends, and went to the grocery store. (Tr. at 35). The ALJ discussed that Claimant's psychiatrist, Dr. Jafary, indicated that Claimant was incapable of even low stress jobs, and her symptoms would frequently interfere with attention and

concentration. (*Id.*). However, the ALJ found Dr. Jafary's statement unpersuasive because it was inconsistent with his treatment notes, which regularly documented that Claimant was psychiatrically stable, and she reported that she was fine, good, or okay and her medication was working well. (*Id.*).

The ALJ also considered the prior administrative findings, including Dr. Shaver's assessment that Claimant did not have any limitation understanding, remembering, or applying information and concentrating, persisting, and maintaining pace. The ALJ found the assessment that Claimant did not have any severe mental impairments persuasive because Dr. Jafary documented that Claimant's overall condition was stable with medication and other providers did not record significant mental health observations. (Tr. at 36). However, while the ALJ agreed that Claimant's mental impairments were non-severe, he found that Claimant had mild functional limitations based on her counseling notes and consultative psychological evaluation. (*Id.*).

The ALJ also evaluated Dr. Capage's assessment that Claimant could understand, remember, and carry out three-step work activities and make simple work-related decisions and would be best suited to a work setting that did not involve a great deal of contact with the public. (*Id.*). The ALJ did not find the assessment persuasive because Dr. Jafary's records indicated that Claimant was stable on medication and her providers did not note significant mental health observations. (*Id.*). The ALJ cited Claimant's statements that her medication was working well in May 2019, doing "okay" in September 2019, stable in February 2020, and "fine" in September 2020. (Tr. at 35-36).

Finally, the ALJ considered the prior ALJ's decision issued on August 31, 2018.

(Tr. at 36). The prior ALJ concluded that Claimant's anxiety and depression were severe impairments and assessed that Claimant had the RFC to perform previously learned complex tasks, could not have contact with the public or be subject to strict production quotas or time standards, and could maintain attention and concentration in two-hour increments. (*Id.*). The ALJ gave little weight to the prior decision because the record indicated that Claimant's mental health conditions ostensibly improved, likely due to the passage of time for bereavement and positive response to medication. (*Id.*).

"Although some consideration of the effects of the claimant's non-severe impairments is required in the RFC assessment, there is no requirement that the RFC reflect a claimant's non-severe impairments to the extent the ALJ reasonably determines such impairments do not actually create functional limitations on a claimant's ability to work." *Hedrick v. Saul*, No. 2:20-CV-00449, 2021 WL 5230735, at *7 (S.D.W. Va. May 21, 2021), *report and recommendation adopted,* 2021 WL 5230987 (S.D.W. Va. Nov. 9, 2021) (affirming the ALJ's decision that mild mental limitations did not restrict the claimant's RFC); *see also Camille B. v. Kijakazi*, No. 2:20CV262, 2021 WL 4205341, at *5 (E.D. Va. Sept. 15, 2021) (same).

Here, the ALJ reasonably determined that Claimant's mild mental limitations did not restrict her ability to work, and his assessment is supported by substantial evidence. Claimant's psychiatrist, Dr. Jafary, repeatedly recorded that Claimant was psychiatrically stable. Although Claimant, at times, expressed anxiety about the flu or coronavirus or had depressed mood around the anniversaries of her son's death, her mental status examination findings were overwhelmingly normal. (Tr. at 786, 792, 794-98, 800-02, 1189-98, 1640-47, 1884-87). Claimant remained on an effective

21

medication regimen, and Dr. Jafary made few changes, nor expressed concerns about Claimant's condition. (*Id*.). The ALJ considered all of the relevant evidence, including Claimant's statements, daily activities, treatment records, and the opinion evidence. He explained that the overall evidence did not reflect mental RFC limitations. For those reasons, the undersigned **FINDS** that the ALJ's RFC assessment of Claimant's mental impairments is supported by substantial evidence.

### B. *Physical Impairments*

Claimant next argues that the ALJ's RFC finding is unsupported by substantial evidence because the record did not include any RFC opinions from treating or examining sources. (ECF No. 11 at 10). She contends that the ALJ should have ordered a consultative examination or requested interrogatories from a medical expert. (*Id*.). Claimant had a consultative psychological examination, and her psychiatrist completed an RFC form, albeit a physical RFC questionnaire, which addressed her mental limitations. (Tr. at 769-75, 1130-37). To the extent that Claimant argues the ALJ should have ordered a consultative examination or submitted interrogatories to her physicians regarding her physical impairments, her contention is unpersuasive for the following reasons.

The ALJ has discretion to determine whether a consultative examination or additional evidence is necessary to make a determination on a claimant's application for benefits. *Elkins v. Saul*, No. 2:20-CV-00410, 2021 WL 1823346, at *6 (S.D.W. Va. Apr. 16, 2021), *report and recommendation adopted,* 2021 WL 1820689 (S.D.W. Va. May 6, 2021) (citing *Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003) ("[T]he ALJ has discretion in deciding whether to order a consultative examination."); *Gorayeb v. Astrue*, 845 F. Supp. 2d 753, 760 (N.D.W. Va. 2011) ("[T]he regulations do

not contain a requirement for medical expert testimony at hearings and specifically state that the use of a medical expert is discretionary.") (citing 20 C.F.R. §§ 404.1527(f)(1)(iii), 416.927(f)(1)(iii)). Generally, an ALJ will order a consultative examination to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on the claim. *Id*.; *Adams v. Berryhill*, No. 2:18CV00001, 2019 WL 2110604, at *12 (W.D. Va. Apr. 29, 2019), *report and recommendation adopted,* 2019 WL 2110587 (W.D. Va. May 14, 2019); *Herschel G. v. Saul*, No. 7:18CV266, 2019 WL 4383141, at *6 (W.D. Va. Aug. 26, 2019), *report and recommendation adopted,* 2019 WL 4345377 (W.D. Va. Sept. 12, 2019).

An "ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ "cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Id*. However, an ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Perry v. Astrue*, No. 3:10-CV-01248, 2011 WL 5006505, at *16 (S.D.W. Va. Oct. 20, 2011) (quoting *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001)); *Fuller v. Saul*, No. 3:19-CV-00174, 2020 WL 597596, at *5 (S.D.W. Va. Jan. 13, 2020), *report and recommendation adopted,* 2020 WL 597425 (S.D.W. Va. Feb. 6, 2020); *Savage v. Saul*, No. 3:20-CV-00482, 2021 WL 2168909, at *8 (S.D.W. Va. May 7, 2021), *report and recommendation adopted,* 2021 WL 2169514 (S.D.W. Va. May 27, 2021); *Lewanda Terriel S. v. Saul*, No. CV TMD 19-1146, 2020 WL 2794588, at *4 (D. Md. May 29, 2020).

The ALJ's duty is to ensure that the record contains sufficient evidence upon

which the ALJ can make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009); *Jones v. Saul*, No. 1:19-cv-275-GCM, 2020 WL 2411635, at *3 (W.D.N.C. May 12, 2020). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

Ultimately, the claimant must establish a prima facie entitlement to benefits, and he or she consequently bears the risk of nonpersuasion. *Bell v. Chater*, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (citing *Seacrist v. Weinberger,* 538 F.2d 1054, 1057 (4th Cir. 1976) and 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.")). Thus, the ALJ is not required to act as a claimant's counsel and can presume that the claimant's counsel presented the strongest case for benefits. *Bell v*, 1995 WL 347142, at *4; *Perry*, 2011 WL 5006505, at *15. The ALJ's duty to develop the record does not permit a claimant, through counsel, to rest on the record and later fault the ALJ for not performing a more exhaustive investigation. *Perry*, 2011 WL 5006505, at *15 (citations and markings omitted).

In this case, the voluminous transcript of administrative proceedings contained 1,476 pages of medical records spanning many years, not to mention Claimant's function reports and testimony, the prior administrative findings, and a plethora of other evidence. Claimant does not identify gaps, inconsistencies, or inadequacies in the

record that should have prompted the ALJ to order a consultative examination or seek additional information from treating sources. Moreover, the ALJ asked Claimant, by counsel, at her administrative hearing if she reviewed the record, and Claimant expressed no objections to the completeness of the record. (Tr. at 54). Claimant had the opportunity to raise any issues concerning development of the record, but she declined to do so. For those reasons, the undersigned **FINDS** that the record was sufficiently developed for the ALJ to make an informed decision on Claimant's application for benefits.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 11); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by

the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** December 9, 2021

Cheryl A. Eifert
United States Magistrate Judge